His call for alignment is Gross v. Herren. Counsel? May it please the Court of Appeals and Counsel, my name is Bill Hamilton and I represent Bill Gross. This defendant in this partnership basically did nothing in this business for a period of 33 years, 1974 to 2007. They're 50-50 partners and my client Bill Gross is doing all the work and on the partnership agreement he's getting $1,000 a month salary that they agreed he would get in 1974. And then they increased it in 1978 to $1,500. So my client's doing all this work in this business, meanwhile the defendant for his 50% share of the profits over these years got over $1,291,000. For doing nothing in this partnership. That was his 50-50 split for the partnership profits. So in 1985 my client sees this pattern of no cooperation from the defendant. He increases his salary to $32,350 a year because he's doing all the work, why shouldn't he get a salary? And the salary is important because that gets deducted off the top and then whatever's left over is what they split. So if my client's getting $32,000 off the top, the profits are less to be split by the partners in the end. So why shouldn't my client be paid this salary? He's doing all the work. The defendant hasn't darkened the door of this pharmacy in years. He's simply not doing anything. So the result of this trial is that the court hears evidence relating to what work was done in the business. And finds that my client, Bill Gross, willfully breached his partnership agreement by paying himself the salaries from 1986 to 2006. And comes up with a whopping verdict of $448,000 in salaries that were ostensibly overpaid to Bill Gross. The fruits of his labor for 22 years. So during this trial, I'm crying now, what about latches? This guy obviously knows that these salaries are being paid. It was right in front of his face. All he had to do was look at the partnership tax returns. It shows the amount of that salary. All he had to do was look at the financial statements. Did he have to sign, both of them sign, the partnership returns? I don't think the defendant signed any partnership tax returns. But the information relating to payment of salary to partner was clearly evident in the partnership tax returns and in the financial statements. All he had to do was look. He never inquired with his account. The record will show that the returns and the financial statements, yearly statements and yearly tax returns, were given to both? Yes. Both the plaintiff and the defendant. The partnership CPA testified that every year they sent those documents out to both partners. And that was undisputed, that both sides had access. They received those tax returns, those financial statements. It's right there in the financial statements. They not only had access to them, they have. Right. They were sent to him every year. I don't think the defendant even disputes that he received them. He said he can have them later if his account died and various other things about where his original records were. But he did not dispute that those documents were sent. So I'm screaming latches at the trial. How can the court enter a judgment going back 20 years, while my client's doing all this work for this business, and say, well, you know, we're going to have to take away half of those salaries because he willfully breached the partnership agreement? In 1986, if this defendant would have said, no, wait a second, time out here. You know, you can't pay yourself that salary. Our partnership agreement is you're supposed to get $18,000 a year. If he would have said time out, my client would have said, well, you know, I quit. Or, you know what, I'm going to go down the street. I'm going to open up another pharmacy where I won't have to split the profits. Or I can go get a job someplace making a reasonable salary. Why should I have to do all the work for this guy who's doing nothing? Literally nothing. And not only is he not doing nothing, he's neglecting the affairs of the partnership because he doesn't do anything with respect to this business. He won't cooperate on any level. The only agreement about salary, the second agreement let's talk about, was to increase it to $1,500 a month. Right. So they started out with $1 and then they increased it. Right. And he just unilaterally increased it himself. He did. And then he told the defendant, although the testimony may have been a little conflicting, but the defendant appears to have clearly been on notice that the plaintiff increased his salary, that Bill Gross increased his salary because he was doing all the work. And he chose to do nothing. He sat on his rocks. How many employees were at the pharmacy? Well, it would have been my client Bill Gross, if you call him an employee. His wife was an employee. There probably would have been, you know, maybe three or four. How many pharmacists? The number of pharmacists would have been. Worked there at any given time? I think probably just the one. Probably just Bill Gross was the only actual pharmacist. Your client was the only licensed pharmacist? I think so. I think that's right. There would have been other people that were workers there. There might have been some part-time people that came through. There weren't a lot of employees, just a few employees. So, I'm in trial and I'm screaming, latches? And even if latches didn't apply, what about the statute of limitations? How can there be any argument at all that this defendant did not know or have reason to know of the payment of these salaries? As a partner, the minute he gets those financial statements, the minute he gets those cash returns, he is on constructive notice of the payment of those salaries. He's got to do something. He can't sit on his right and let my client work his tail off for 20 years and come into the year 2007 and find out he's got to give up half of the salaries that he earned over all those years. It's totally unconscionable. My client could have done something differently if he'd have known that the defendant was going to argue about the salaries. Clearly, the amount that he was paid was in excess of what that partnership agreement said within the four corners of the document. Does the record indicate why your client didn't ask for the mutual agreement of the partners to increase the salary? Well, the record in the second hearing, there was discussion about, you know, I told him that I was going to take an additional salary. The defendant didn't really respond one way or the other. He seemed suspicious that maybe the salaries were being paid. But back in 1986, there seems to have been an indication that the plaintiff, Bill Gross, informed the defendant of these additional salaries. The testimony that seems to be directed to that point is that this is the defendant's testimony. He states, in reference to the question about the additional salaries, he says, and he kind of looked at me funny, said I increased my salary. So I didn't say anything, but that's when I had, I think I had a letter sent to him or he had a letter sent to me from Farrell. I can't remember. That's his statement. So he obviously knows at this point that there's an issue about the salaries. He's admitting he was told. And that was 20-some-odd years ago? 1986. So how can he seriously contend that he does not know or have reason to know of the payment of the salaries? He obviously does. He had actual knowledge. He had reason to know. He had constructive reason to know. I guess my question is this. Why wouldn't your client try to comply with the paragraph A of the original agreement here, I guess, that the salary may be reviewed and redetermined from time to time by mutual agreement parties? Or does he think that he did comply with that? He thinks he tried, but the defendant would never negotiate it, and the defendant would never talk about it. That's in the record, I guess. Right. And the defendant's complete lack of cooperation comes to a head in 2006 when we filed a lawsuit to constructively dissolve a partnership under partnership law principles. We have a deal on the table to sell this business for $1,200,000. Everybody signed the agreement. The defendant won't say, well, no, I don't like that deal. That's not a good deal for $1,200,000. He won't say, I think we should get more. He does nothing. He doesn't say yes. He doesn't say no. So we file a suit. We ask the court to enter a preliminary injunction. We're on the courthouse steps. The defendant is faced with the realization that this business is going to be sold. The court's going to order it. It's got to be ordered. It's crazy not to take a deal for $1,200,000 and walk away with $600,000. We might have to beat the defendant over the head with a club to get him to sell the business. So the court enters an order granting a preliminary injunction. We sell off the business. The new owners come in. They pay the money. Everything's great again. But then the defendant has, I submit, the audacity to come back and say, we're going to take these salaries away from you for your 20 years of hard work. Why I did nothing in this partnership business. And that's fair. It can't be fair. I don't care what that partnership agreement is. Principles of equity have to come into play. Latches is obviously the issue in this case. It's just simply unreasonable. It's unfair for the defendant, Mr. Herron, to wait that long and say, okay, I want half that money. At any point in time, in 1987, in 1992, at any point, he could have said, you know what? These salaries are wrong. I'm not going to let you do that. You're taking salaries in contravention of the agreement. Give me half that money now. But it doesn't happen. It doesn't happen until after we've actually got the business sold. So everything in this case seems to be premised on the concept that Phil Gross breached the partnership agreement in 1985 when he paid himself the salaries, but nothing is ever construed against the defendant in the case. The defendant obviously knows about the salaries because he admitted it. He is deemed to have knowledge on the partnership back. It was right there in front of his face in the tax returns and the financial statements. He never talks to his accountant to see if the salaries were being paid. He never talks to the partnership's accountant about these salaries. He doesn't consult with a lawyer. He doesn't do anything. So they keep saying, well, yeah, Phil Gross has breached the contract, but what about the defendant? He's not doing anything. He's not participating in the major management decisions of the company. He's in complete neglect of the affairs of the company. The court excludes testimony of a client trying to interject into the case related to their discussions before they enter into an agreement because the court says, well, that's got nothing to do with the partnership agreement. You're stuck with the agreement. But those discussions, those negotiations come into play on the subject of laughing, on the subject of unjust enrichment. I mean, we can't bury the contract. We know that. We're not disputing that. The contract is clear enough. But under these equitable principles that come into play, it's simply unreasonable for my client to be expected to do all this work and then hand back half of the fruits of his labor 20 years later. They want to say the plaintiff didn't breach the contract, but what about the defendant? The defendant didn't breach the contract. He didn't do anything he was supposed to do. They keep saying the plaintiff, he's a breach of fiduciary duty. He didn't reach the highest level of a duty required by a partner. Well, what did the defendant do? Nothing. The defendant's a breach of fiduciary duty. The court, once the court made the decision that there was a willful breach of the partnership agreement, the court considered nothing else that was before her in making the decision it's wrong. It's got to be wrong. This is the kind of case about it being a law school textbook someplace showing latches. You can't wait this long to bring a claim. It's just totally unreasonable. His self-serving testimony that, well, I didn't know about these extra salaries until somebody gave me the schedule in my 2006 is ridiculous. He obviously didn't, and he had the information available to him. He should have brought his claim years and years before that. And the defendant is the one who breaches fiduciary duties, not the plaintiff. The plaintiff did the right stuff. He stayed there and he worked in the business. He built the business. If you look at these partnership tax returns every year, the revenue is going up. The defendant is being richly rewarded for his 50 percent interest in this business.  He works something like seven days in this business, maybe 14 if you accept his testimony. $1,291,000 over the course of these years for doing virtually nothing. You can't hold a good deal against him, can you? I think it's an unjust enrichment based on his discussions before they signed the partnership. That's not part of the case, though, is it? Yes. We made a claim for unjust enrichment against this defendant suggesting that that $1,291,000 is unfair. Based on what he did and the way he acted with Bill Gross, the way he wouldn't cooperate. Let me get this straight. There's a claim before this court that the partnership should be divided more than 50-50 in your client's favor. The claim that's before the court is based on unjust enrichment of the defendant in keeping $1,291,000. That's his 50 percent share of the business over these years based on his bad faith negotiations doing absolutely nothing. Which is independent of this main issue that's before the court, which has to do with salaries. There's $448,000 on the table, which is half of the salaries paid to Bill Gross above this $18,000 number. I submit that's crazy. That shouldn't be. But as to the unjust enrichment, I mean, I think it supports our position on all levels. It's just unreasonable for him to keep $1,291,000. And what does the record show the defendant owes your client other than half of the salary? Well, the court ruled against us on the unjust enrichment. It found that that $1,291,000 stays with the defendant. I'm not sure if that answers the question. And you're appealing that, right? Yeah. Okay. It's not our main issue, but it's an issue. How much of that does your client believe the defendant unjustly enriched himself? I think all of it or at least some of it, but the court never considered that issue. The court never really got to the point. After she determined that the plaintiff was in breach of contract, there was no development of the record on unjust enrichment. Well, obviously, by not commenting on it, she must have thought that there was no unjust enrichment. Otherwise, she would have set that off against what you claim was the improper set off for the salary. Right. So you're asking for a remand. You're asking to reverse her setting off of the salary portion, and you're asking for a remand of your claim for unjust enrichment. Yes. I'm asking the court to draw out the $448,000. I'm asking the court to enter set off for this $1,291,000 in the alternative. I'm asking the court to give us judgment or to go back to the trial court and have her make a determination of how much of that money should go back to Bill Groves. But that's not the central point of the appeal. It's that $448,000. That's an incredible amount of money. Right. Let's put that aside. Okay. How much of your client claimed that the defendant was unjustly enriched? $1,291,000. The whole amount? Yes. So he wouldn't be entitled to anything in the partnership? Yes. Didn't do anything with the business, to speak of. Wasn't that contemplated under this agreement? It seems to me it was. Obviously, you don't let something go for 25 years or 20 years or whatever when the guy's only working seven days unless that was what you thought you were entering into. But the court excluded testimony that my client tried to indicate about their discussions prior to entering into the partnership. They had a discussion around the dining room table one day right before they did the business. And there were discussions about, well, how much work is Mr. Heron going to do in the business? How much work is Mr. Groves going to do in the business? Would your client be guilty of latches for not complaining about this for 30 years also for the unjust enrichment? I mean, isn't that the... He certainly could be. Goose and gander argument there? He certainly could be. Why wouldn't he be guilty of latches with regard to that portion of the lawsuit? I think that issue would be fairly raised. And I doubt the private court is going to give us the whole amount, but they ought to give us something on that unjust enrichment. And the court never got to it. The court just said, defendant, for plaintiff, you are in breach of contract. That's the end of the case. Didn't consider any of the equitable issues before the court. If this court would address only the salary issue, it would still have to remand it back for a determination of the unjust enrichment? Is that what you're saying? No, I don't think the court would have to do that. This court could pretty much do whatever it wants with the case. It could throw out portions of the verdict. It could decide to throw out portions of it and remand it for a hearing on unjust enrichment and whether those latches... We've got a claim in here for the legal fees associated with having to drag the guy to court to sell the business. You know, there was a cost to that. And under the common fund doctrine, that amount would be paid off. Did the trial court address at all your unjust enrichment claim? I don't think correctly, other than to rule against us. We were not permitted to develop a record to a great extent as to how unfair it was that this guy should get all this money for his 50-50 share. I don't think it was... The only thing the court really addressed was, you know, the contract says this, you paid yourself a salary. If you partner with a bad guy, you should pay half that money back. So you weren't allowed to present evidence or whatever you wanted to, is that right? Right. So at the very least, it would have to be remanded back for that determination, would it not? We'd like the court to do that. I don't think the court would have to remand it. You know, obviously there are standards that we view. But the unjust enrichment issue was not really completely developed at trial because the court excluded the evidence relating to the things that took place on the dining room table. The court didn't seriously consider this pattern of a complete dereliction of any responsibilities with the business. I mean, the partnership agreements... I guess my question is, would your client be satisfied if this court addressed the set-off of the salary? I think we'd be thrilled, yeah. We'd be very happy to see the $448,000 thrown out and or a determination made as to how much the set-off should be. We'd be really happy with it. But the court didn't really develop the issue about unjust enrichment because... or really the last, because once she found that the agreement says thus and so, she basically didn't think it had been handed to her in terms of the partnership agreement. But the partnership agreement says that he's supposed to participate in major policy and management decisions. And so part of that participation is things like, let's talk about the salary. I see I didn't have a lot of time. Thank you, Counsel. Counsel? Please support Mr. Hamilton. Your Honors, my name is Bob Fariga. I represent Mr. Heron in this case, the defendant. What happened in this case is Mr. Hamilton's firm wrote this contract, this partnership agreement, that Heron was abiding to as my client. And in the body of the agreement, as I point out in my brief, that was exactly what was supposed to happen. Mr. Gross was supposed to do all the work. It says it right in the agreement. At the time of the agreement, which is in the record, Mr. Heron owned three other businesses that he was dealing with. So there was no question that there is some language in there about if there's any major decisions to be made. There to confirm he was never contacted by Mr. Gross, according to the record. As a matter of fact, in the record and under direct testimony before the judge, his client, Mr. Gross, said the reason he raised his salary was that Mr. Heron sold an adjacent piece of property to the pharmacy, that the pharmacy partnership owned, and he tried to get – he asked Gross to let him have a commission on it because he's the one that sold it. And Heron said – or Mr. Gross said he got mad because of that, and that's why he started raising his salary. He said that, you know, under Cross, right in front of the judge. And I said, well, you knew how to do – how to get your raise because you did it in 78 when you did the Second Amendment to the partnership where you raise the salary from $1,000 to $1,500. Yeah, I knew how to do it. I mean, you had no contact with Heron after that. He goes, no, I was mad at him. We couldn't even talk. So that was the way it was. So this court, like the trial court did, they gave creeds to the legal binding partnership agreement between the parties written by Plaintiff's lawyer, and it was actually the partnership lawyer that their firm was. So is the agreement silent as to future salary increases? Because I can't imagine I'd ever sign a contract that could last for 50 years paying me the same amount from year one to year 50. No, it's not silent, Judge. I cite it in my brief, and it's part of the appendix I've got at A2, I think. It's got the language in there on what he can do to get a salary increase. And as a matter of fact, Judge, in appendix A – let's see – on A8, where I've got – it's an actual – where they raised the salary of $1,500 pursuant to that fact, where they signed off on it. It's in the blue cover. And he actually, in 1978, actually came back and got that increase, you know, pursuant to the partnership agreement. Exactly what – now, Mr. Heron's testimony in front of the judge, what happened, Judge, they tried to sell – they tried to get Mr. Heron to sell his part of the partnership out for like $200,000 and some odd early on. And he said, I'm not doing that. He was having cancer treatment up at some – I don't know if it was Mayo or what, but there was a pharmacy college across the street, so he went over there and inquired – and this is all on record – does anybody value pharmacies? And that's when he got the name of this guy that actually did that for a living. And that's where this Exhibit 3, which is A10 in the blue brief, that's when he first learned about this salary discrepancy, when they had to put all this information together for the valuation of the business to give a value to the pharmacy. That was where – when he first found out about this disparity. And that's what the court found in the order and says it on record. You're claiming that your client believed that his partner, who he knew was working full-time there, was making $1,500 a year for the last – from 70 for the last 30 years? Well, Judge – Is that what your client – No, Judge, that's not at all accurate. He was getting – he got the same million, too, that my client got, and in addition to that he got his salary. They split – at the end they split the profits. So that $1,250,000 that he says my client didn't do anything for, he got that same million, plus the salary he was supposed to get for what he did as he increased his salary. And they were 50-50 partners. Correct. So what I'm saying then, your client was under the impression that his 50-50 partner was working full-time for $1,500 a month more than he was getting not working at all. That's correct. It was 1,000 first, and then it went to 1,500 because he was the – my client was the guy at the money man, I guess, in the early days, and that's the way it stayed. And he had a provision in the agreement. The contract has a provision to increase, which he exercised in 78. So he knew how to do it if he wanted to do it. He said he – I got mad at him because he wanted part of the interest. He wanted a percentage for selling that lot, so I never talked to him after that. That was 86. But then the carrier stepped further. They tried to get him to sell the partnership agreement – or sell the partnership for 200-something thousand to some – to a pharmacist that was actually working in the Brighton pharmacy. They actually bought it. Another pharmacist that worked there actually ended up buying it. But because my client got this guy to evaluate the value of it, it increased. Then they offered him, like, a little bit more money, but then when my client's expert got involved, all of a sudden it was 1,000,002. Had they sold it for the 268 apiece that was proposed to my client, which I think was probably – I don't think it's a record that it was fraudulent, but they had to know that that partnership was worth more than that when they ended up getting 1,000,002 less than a year later based on my client's inquiry and hiring an expert. So that's part of the deal. It doesn't jump right out, but the judge, under direct testimony, this gentleman says he knew how to do it. He said, I wasn't going to do it. I was mad at him. There was no discussion, like counsel said, about I'm going to raise my salary. He didn't do anything. The only discussion was they sent him a letter from his law firm, and he never responded to it. Is there any disagreement that your client got the financial statements and the partnership tax returns on a yearly basis that had the salary in there? He got whatever that form is attached to the partnership agreement sent to him, and he said he probably briefly looked at it. He settled into the record and forwarded that on to his accountant. So, I mean, he could have very easily ascertained that his partner was actually drawing more than $1,500 a month. Well, I would say it's possible, Judge, that this guy was going through cancer treatment and all kinds of health issues for a number of years. My client was. So whether he looked at it, he said he looked at the documents. So he could have, I guess, he had sat down and had somebody. It didn't jump out like it did in Exhibit 3. Did your client, I thought I remember reading, your client owned a number of other pharmacies? He owned three of them. That's when they signed the first agreement. Did he manage those other three pharmacies, or did he have to hire some pharmacists to run those other pharmacies? Is that part of the record? Judge, I don't know if that's part of the record, but I think he had employees. If it is part of the record, how much did he have to pay the other pharmacists to run the other pharmacies? Is that in the record? No, it's not in there, Judge, and I don't know the answer. So we can't assume that it would be substantially more than $1,500 a month? Well, I would have to assume it would be. But that wasn't the deal here. They all knew this. I mean, $1,000 a month for a pharmacist in 74 was cheap, but it was part of this 50-50 deal. I mean, he made good money all the way through. Now, that's another issue. He says his client did all the work. If you look at the money that was paid out to other employees, that's why my client didn't agree to the – that's why he said he didn't agree to ever give him another raise because he was – every time he went in there, contrary to what they said, Bill Gross was never in there. Somebody else was always in there. This is a 4,000 – a population of Brighton, Illinois, Your Honor, which I don't think it's more than 4,000 people, a small pharmacy, and you can look at the payroll. Not to mention, if you look at the – on Exhibit 3, he's got what he's paying his wife. I mean, for a non-pharmacist working in a pharmacy in 1976, he paid her $76,500 because he knew he was getting away with it. That's for a non – just for somebody working in a pharmacy, 76.5 in a town of about 400. You know, and if you look at her salaries, he started doing the same thing for the wife. In 2005, he paid her 60. In 2004, he paid her 40. Now, we didn't make that part of the – the reason we didn't make that part of the case is my client felt responsible because that's what Bill Gross was supposed to do is take care of business, and he paid her the salary, and he – for that reason, he did not try to get any part of the wife's salary back. Was he aware of that? He is. He was when he got Exhibit 3. He wasn't aware of it before then. And Exhibit 3 sets out what the wife and him both got. Now, and that's – He was aware that other people were being paid by the partnership over all these years, though, right? Yeah, he was aware. That's why he said he didn't want to pay Gross because every time he went in there, Gross was never there. You know, it was kind of – now, I don't know how much work Gross did or didn't do. I don't think that's in the record, but it's – that was his reasoning. And, you know, and, Your Honors, and I cite the cases that say the agreement is the binding document, but that's what the agreement says in 74 that Mr. Gross has to do all the work. That's what it says right in the agreement. They want to talk about what was said beforehand. Well, their firm wrote the – his lawyers wrote the agreement. Actually, they were the partnership lawyers, which is another issue on his attorney's team. Why shouldn't latches apply? It shouldn't apply because it's not an equitable matter. It's a contractual issue, and it specifically states in the contract how he's to get his raise, which he did in 78, and it says that my client's going to get half the profits less whatever Mr. Gross is making. That was from the outset. You know, in 74, he was only getting $1,000, and in 78, they went to $1,500. But then when Mr. Gross said he would show up and see Gross never there, he didn't agree to any further increase. I mean, the contract was still in place all the way up until the sale in 2006 or 7, whenever it finally went through. Well, opposing counsel claims that his client, had he known that your client would have objected strenuously to any salary increases, would have requested the partnership be dissolved immediately. Well, Judge, that was not his testimony. His testimony under oath was I got mad because he wanted part of that real estate commission that I didn't think he should get, so I stopped talking to him. And I said, well, you knew I'd get a raise if you wanted one, didn't you? And he says, yes. And you didn't do anything? He says, no, he didn't do anything. The only thing that happened is, I guess almost 20 years ago, he had the Ferrell firm write him a letter, write my client a letter, asking for an increase, and he didn't respond to it. That's the only thing that's in the record. He did nothing else after that as far as trying to get a raise, and he knew the mechanism. He could have pushed for a sale back then, but you can't just start helping. Mr. Gross, I don't believe so, Judge, because he didn't testify to that. And also, the partnership agreement specifically states how to get that raise. He said he didn't even talk to him until the record in the 80s because of that real estate commission on a lot next to the pharmacy. He never, ever talked to him after that. And he knew how to get the raise. You can't just neglect. Parties can modify contracts by a lot of different ways. That could be one way that they could modify by their conduct, could they not? Well, Judge, I'm not a partnership lawyer to tell you the truth, but I think you'd have a written partnership agreement in place. The only place I know of where people can modify contracts is in the sports arena where you have baseball players that after they hit 500 or have a great season, they want to renegotiate their contract. But what you're saying, lab just can never apply to a contract? I don't think it can if the provision is in there. The contract says my guy has to get half less whatever was paid out on expenses, which was the case all the way through, so he's not going to know what Gross is doing. Now, the reason he knew was when he got that Exhibit 3 and that evaluation of the partnership. I don't know if you can – I don't think you can just neglect the terms of the contract that you need to do to get the raise. It states it specifically how he does it, which he did in 78. I don't think you can just ignore that, especially when the judge actually found that Mr. Gross was coming in with totally, as the way she said it, totally unclean hands. And, you know, he who seeks equity must do equity, but I don't think it's an equity argument here. It's a contract argument. I don't think equity enters in unless you didn't have a contract, more so. I don't think you can make these admirable arguments when the contract addresses each of those specific points, how to get the raise, which he did. He exercised it. He obviously knew how to do it. And it's just my client shouldn't – and I think the judge felt this way more. My client should not be – because he made a good deal, he shouldn't be punished now. I mean, this comment that all a million, too, ought to be given back to his client because he did the work, that's what the agreement states is going to happen. He's going to do all the day-to-day work. So he just – my client – there was nothing my client did not do under the contract, and there's nothing in the record where Mr. Gross ever asked my client to make some major decision in a partnership. It just didn't happen, and there's nothing in the record to that effect. So, you know, if we just follow the contract itself, he should have exercised those provisions that he had, and he knew that Mr. Gross told him, no, I'm not agreeing to any raises anymore. You're not in there half the time. And the only – and that was back in 86. It was never discussed after that because he said he was mad at him, and they never talked until when this contract – or when this – when they were trying to sell the partnership, the pharmacy. And it was through Mr. Gross's – or Mr. Heron's work to get this expert in at a value of a million, too, was the reason they got that kind of money. They were trying to get him to take 268, you know, which is a far cry less than a million, too. And I don't know if that was really above board. I think they knew what they had, and they were trying to buy him out before it was sold. But that's also – the judge specifically found he breached his fiduciary duty, Mr. Heron, Mr. Gross did. And I think Mr. – there were other hearings where they addressed all of his issues that he raised. I don't recall this – him ever wanting a million, too back. I mean, that's the first I heard of that was today. I mean, that was what the agreement was, to split less the expenses. I don't know if I can – and this comment that Mr. Gross told him to – that he was going to raise the salary, that's not in the record anywhere. As a matter of fact, he said the opposite of that under Cross, even – and he just – he didn't do it. He didn't say that about – it stayed side. I'd be happy to answer any other question if anything's – thank you, Your Honor. Thank you, Counsel. Counsel? One of the questions was whether the defendant could have easily ascertained that more than $1,500 was paid, and the answer to that is clearly yes. The defendant testified that in pharmacy school he had to take business law classes. He took business law and accounting courses. He had an interest in four businesses, and his accountant gave him financial statements, but he said he didn't read them in depth. So he clearly had the mental faculty to be able to figure out that these salaries were being paid. Now, as far as the reasonableness of the salaries, the testimony will show that nobody ever contended that these salaries that Bill Gross unilaterally paid himself were unreasonable. The defendant wasn't saying that that was an unreasonable salary at all. He was just saying that wasn't approved in the contract and you can't have that. Reasonableness is not an issue. They weighed that issue. And they keep coming around the circle to salaries paid to Mr. Gross' wife. She was working full-time in the business, too. They never made a claim for those wives' salaries. They seemed to think it had some relevance to the case. I submit it had none. Bill Gross had the right to hire his wife and pay her salary. But Mr. Herron never objected to that payment of that salary. So, in conclusion, what I'd ask the court to do fundamentally is vacate this judgment against Bill Gross for $448,000. That judgment is shocking and unconscionable. That judgment cannot stand. Alternatively, the court should try to properly apply the statute of limitations. I don't see how that could possibly go beyond the 10 years. There's a 10-year statute of limitations for a claim of breach of contract. There's a five-year statute of limitations for a breach of fiduciary duty and a five-year statute of limitations for unjust enrichment. I would ask the court to remand the case to the trial court for consideration of all of the relevant evidence that had to do with the equitable theories of recovery, the latches, the unjust enrichment. The plaintiff did make a claim for unjust enrichment. That's count three of the amended complaint. We're saying that this $1,291,000 that Mr. Herron got to keep is wrong. But that was the amount that each party got for their 50-50 split. They each got $1,291,300. But the problem that was raised by the defendant is that about $900,000 was paid off the top as salaries to Bill Gross, and they're saying we want half that money. We want $448,000 because that would have been our half. So the other half obviously would have gone to Bill Gross because he was a 50% partner. So the $448,000, hopefully that math makes sense, but that's the issue. We'd ask the court to remand the case to determine damages for defendants unjust enrichment. We'd ask the court to remand the case to assess the legal fees that Bill Gross was incurred in securing a benefit for this business by forcing the sale of the business. Those legal fees ought to be paid off the top. Thanks. Thank you, counsel. We appreciate the briefs and arguments. The counsel will take the case under advisement. The court shall recess until 1 p.m.